In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 09-1554 & 09-2903

RUSSIAN MEDIA GROUP, LLC,

*Plaintiff-Appellee,*

*v.*

CABLE AMERICA, INC. AND SHAI HARMELECH,

*Defendants-Appellants,*

and

USA SATELLITE & CABLE, INC.,

*Intervenor-Defendant-Appellant.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 1:06-cv-03578—**John W. Darrah**, *Judge.*

ARGUED JANUARY 14, 2010—DECIDED MARCH 10, 2010

Before FLAUM, ROVNER, and HAMILTON, *Circuit Judges.*

HAMILTON, *Circuit Judge.* For nearly ten years, plaintiff Russian Media Group, LLC has battled in court with defendant Shai Harmelech and his companies, charging that Harmelech pirated Russian-language satellite televi-

sion programming to enable him to compete unfairly against RMG's legitimate business. The district court found RMG's complaints justified and enjoined Harmelech and the other defendants from distributing Russian-language television programs to twenty specific apartment houses where they had been operating illegally. Harmelech and his companies appeal both the preliminary injunction and an emergency motions judge's denial of their motion to modify the preliminary injunction. We affirm in both cases.

I. *Background*

The district court's factual findings, which defendants do not contest, were unfavorable to Harmelech and his companies. At each of the twenty properties at issue in this case, defendant Cable America, Inc. connected an individual subscriber's DIRECTV- or DishNetwork-issued satellite receiver to the property's master antenna system, allowing Cable America to distribute Russian-language programming throughout the building without the many other customers having to pay DIRECTV or DishNetwork. Instead, Russian-speaking customers in those properties paid Cable America a monthly fee of $25 to $30. Cable America kept this arrangement secret from DIRECTV and DishNetwork, whose signals it was pirating, and shared none of the fees it collected with those providers. In essence, Cable America was defrauding DIRECTV and DishNetwork by having one customer pretend that he or she was merely an individual subscriber, and then using that customer's subscription to resell the programming for Cable America's benefit.

Just as a fence can sell stolen watches for less than a jewelry store charges for legitimate goods, this dishonest business model allowed Cable America to compete unfairly against RMG, which also sells Russian-language programming to residential customers. RMG competes with DIRECTV and DishNetwork to provide that programming in many of the same buildings where Cable America set up this scam. RMG receives $39.99 a month from each person subscribing to its Russian programming package, but it must pay the costs of legally obtaining that programming and maintaining the hardware to transmit it to subscribers. Cable America, by obtaining the programming by fraud, incurred fewer costs and pocketed a larger portion of its monthly fee than RMG could. It also induced RMG's subscribers to switch away from RMG because of the lower fee.

RMG filed this suit against Harmelech and Cable America on June 30, 2006. After discovery had proceeded and the court had denied Cable America's motion for summary judgment and motion to dismiss, RMG moved for a preliminary injunction on March 7, 2008. In a June 26, 2008 hearing on the motion for preliminary injunction, RMG presented evidence that it was likely to succeed on its claim under the Illinois Cable Piracy Act. See 720 Ill. Comp. Stat. § 5/16-18 *et seq*. Harmelech testified in defense of himself and Cable America. (At the time of the hearing, defendant USA Satellite & Cable, Inc. was not a party to the suit. In his deposition testimony before the hearing, Harmelech had falsely denied that he controlled USA Satellite, a lie that was discovered later.) Harmelech testified first that Cable America merely charged for maintenance services that it provided in the

subject properties. Later, he changed course and admitted that Cable America distributed the programming itself, but he claimed falsely that its distribution was authorized by the content owners. The district judge wrote that Harmelech's contradictory explanations for Cable America's conduct were "unsupported and contrary to the evidence," and that his testimony was "unpersuasive and completely lacking in credibility."

On February 19, 2009, the district court issued the requested preliminary injunction. Although RMG had alleged three separate theories of liability, the district court relied only on the Illinois Cable Piracy Act, which allows an "aggrieved" party to sue those who pirate the communications services of others and thereby injure the plaintiff. See 720 Ill. Comp. Stat. § 5/16-21. Concluding that the Illinois Cable Piracy Act was sufficient to support the injunction, the district court declined to consider RMG's other legal theories. After finding that Cable America had violated the Cable Piracy Act and that RMG was an aggrieved party, the court ordered Harmelech and Cable America to cease all distribution and transmission of Russian-language television to the twenty subject properties, and to disconnect any receivers they had set up to distribute Russian television in those properties.[1]

---

[1]  The injunction reads in full:

It is therefore ordered that Defendants Shai Harmelech; Cable America, Inc.; Defendants' owners, officers, directors, agents, employees, successors, and assigns; and all individ-
(continued...)

Harmelech and Cable America appealed the injunction to this court on March 2, 2009, but they did not comply with the injunction. To begin with, they did not disconnect the illegally configured receivers. Further, in his response to RMG's request for contempt of court sanctions, Harmelech claimed falsely that it was USA Satellite, not Cable America, that controlled the receivers, and he claimed falsely that he was powerless to comply with the injunction. After the defendants retained new attorneys, Harmelech conceded that he was in fact in control of USA Satellite, but he claimed through his new attorneys that he had "believed that he could take the position that he could not force USA to disconnect the Russian television service" because "USA

---

[1] (...continued)

uals or entities controlled by Defendants or in active concert or participation with Defendants are preliminarily enjoined and restrained from distributing, transmitting, causing the distribution or transmission of, or maintaining any system that distributes or transmits Russian-language television programming to any of the tenants residing in the Subject Properties.

It is further ordered that Defendants Shai Harmelech and Cable America, Inc. shall disconnect any receivers in the Subject Properties that distribute or transmit Russian-language television programming that were installed or are maintained by Defendants Shai Harmelech; Cable America, Inc.; Defendants' owners, officers, directors, agents, employees, successors, and assigns; and any individuals and entities controlled by Defendants or in active concert or participation with Defendants.

is a separate legal entity and a non-party to this case." The district court then held Harmelech and Cable America in contempt on May 5, 2009, but even six days after that, on May 11, 2009, RMG complained that almost all of the receivers were still connected. Faced with this obstinate refusal to comply with the injunction, the district court finally issued another order authorizing RMG itself to disconnect the defendants' receivers so that the preliminary injunction could have the intended effect.

USA Satellite intervened as a defendant in May 2009. Two months later, on a day when the assigned district judge was not available, the defendants filed an "emergency" motion to modify the injunction. The motion was based in part on a new defense of federal copyright preemption. The emergency judge denied the motion to modify for three reasons: it was untimely, it was not a genuine emergency motion, and the district court lacked jurisdiction to modify an injunction that was already pending before the court of appeals. The defendants appealed that order on July 28, 2009.

II. *The Scope of the Injunction*

The defendants first contend that the district court's injunction is too broad because it enjoins any transmission of Russian-language programming to the subject properties, including legal transmissions. In light of the extensive evidence of the defendants' misconduct, we conclude that the district court did not abuse its discretion in writing the injunction as it did: targeted at the wrongdoing, but broad enough to be effective.

A preliminary injunction order must state the reasons why it issued, state its terms specifically, and describe in reasonable detail without referring to any other document the acts that are prohibited or required. Fed. R. Civ. P. 65(d). But the injunction must also be broad enough to be effective, and the appropriate scope of the injunction is left to the district court's sound discretion. See *PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1272 (7th Cir. 1995) (affirming scope of injunction).

In particular, the district court has the discretion to issue a broad injunction in cases where "a proclivity for unlawful conduct has been shown." See *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 192 (1949) (finding that injunction barring violations of Fair Labor Standards Act was justified based on defendant's "record of continuing and persistent violations" of law); accord, *Lineback v. Spurlino Materials, LLC*, 546 F.3d 491, 506 (7th Cir. 2008) (affirming injunction against specified violations of labor laws and against actions violating the law "in any like manner"). The district court may even enjoin certain otherwise lawful conduct when the defendant's conduct has demonstrated that prohibiting only unlawful conduct would not effectively protect the plaintiff's rights against future encroachment. See *FTC v. Nat'l Lead Co.*, 352 U.S. 419, 428-30 (1957) (affirming broad FTC order because lawbreakers "must expect some fencing in"); *General Instrument Corp. of Delaware v. Nu-Tek Electronics & Mfg., Inc.*, 197 F.3d 83, 89-91 (3d Cir. 1999) (where defendant had shown persistent pattern of pirating cable television signals, affirming injunction against distribution of devices that could be used to pirate cable

television signals even where devices might have lawful uses); *Sasnett v. Sullivan*, 91 F.3d 1018, 1021 (7th Cir. 1996) (recognizing "the familiar principle of equitable remedies that an injunction or other equitable decree may fence the defendant in, forbidding lawful as well as unlawful conduct in order to prevent the evasion of the core prohibition in the decree and to extirpate any lingering effects of the violation sought to be remedied"), *vacated on other grounds*, 521 U.S. 1114 (1997).

The defendants' objection that this injunction is too broad rings hollow. The evidence shows that Harmelech's business model, at least for the last several years, has been quite simply to steal television programming and then to resell it at a discount. Harmelech has now admitted the unlawful conduct that gave rise to the preliminary injunction, but at the June 28, 2008 hearing, he denied any wrongdoing and instead offered inconsistent, incredible, and false explanations for his and his company's conduct. Given the defendants' pattern of misconduct and the record of dishonesty in the district court, the district judge did not abuse his discretion in framing the injunction as he did.

Events after the issuance of the preliminary injunction confirm the district judge's belief that a broad injunction was needed. After the district court ordered defendants to disconnect their receivers and stop operations at the subject properties, the defendants refused to do so. Then they tried to conceal that refusal from the district court by trying to blame USA Satellite, all the while sticking to Harmelech's false story that he had no control over

USA Satellite. By the time the defendants finally con-
ceded that they were violating the injunction, they had
been concealing Harmelech's control of USA Satellite for
more than two months as they evaded the court's order.
This level of deception and obstinacy makes the district
court's decision about the scope of the injunction look
downright prescient.

If the defendants can show that they have a plan to
compete legally for business in the twenty subject proper-
ties, they should seek a modification from the district
court that issued the injunction. That court is in the
best position to conduct the fact-finding needed to deter-
mine whether the injunction should be modified.[2]

III. *Federal Copyright Preemption*

The defendants argue next that the injunction is invalid
on the theory that federal copyright law preempts the
Illinois Cable Piracy Act on which the injunction is
based. The defendants raised this defense for the first
time in their motion to stay the preliminary injunction on
May 26, 2009, three years after the lawsuit was filed.
Neither the assigned judge nor the emergency motions

---

[2] On November 10, 2009, while this appeal was pending, the
district court denied the defendants' motion to clarify the
preliminary injunction. The denial appears to have been
without prejudice, so the defendants remain free to file a new
motion to modify with the district court. The existing injunc-
tion remains in effect pending any possible modification.

judge considered or ruled on the preemption issue. Because the district court might have approached the case very differently if defendants had raised their preemption defense in a timely manner, it would be inappropriate for this court to vacate the injunction on the basis of that defense.

In civil litigation, issues not presented to the district court are normally forfeited on appeal. See *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 391 (7th Cir. 2007), *aff'd*, 553 U.S. 442 (2008). We may consider a forfeited argument if the interests of justice require it, but it will be a "rare case in which failure to present a ground to the district court has caused no one—not the district judge, not us, not the appellee—any harm of which the law ought to take note." *Amcast Industrial Corp. v. Detrex Corp.*, 2 F.3d 746, 749-50 (7th Cir. 1993).

This is not such a rare case. RMG sued the defendants under three Illinois statutes. The first, the Illinois Cable Piracy Act, targets only theft of and interference with communications services. The second, the Illinois Consumer Fraud Act, is a broader statute targeting fraud against consumers. The third, the Illinois Uniform Deceptive Trade Practices Act, deals with trademark infringement and passing-off. The preliminary injunction order relied on RMG's Illinois Cable Piracy Act claim alone. The district court found it "unnecessary to consider whether RMG could also prevail under the ICFA or the IUDTPA." If the defendants had raised their copyright preemption defense before the district court issued its injunction, the court might have found that the

defense applied and in that case could and would have gone on to consider the claims under the other two statutes. One of those claims, in turn, could well have been the basis for a valid injunction even if the copyright preemption defense has merit.[3]

The defendants did not raise the preemption defense until after they had appealed the preliminary injunction, and the district court has rightly refused to consider modifying or vacating the injunction while it is pending on appeal. It is not appropriate for this court to overturn an injunction on the basis of a defense that the district court had no opportunity to consider.

------

[3] Even in the absence of a statutory claim, the common law of tortious interference with business relationships may also offer relief where one competitor breaks the law (as by stealing the merchandise or pirating the programming) to enable it to induce customers to shift their business from a legitimate business. See Restatement (Second) of Torts § 766B (1979) (for actor to be held liable, he must interfere "improperly"); § 767, comment c (use of "wrongful means," including fraudulent misrepresentation, may be critical to tort claim), and § 768 and comment e (in case of alleged interference by competitor, whether the competitor employs "wrongful means" such as fraudulent misrepresentation is critical to tort issue); see generally *Dowd & Dowd, Ltd. v. Gleason*, 693 N.E.2d 358, 371 (Ill. 1998) (noting that plaintiff alleging tortious inducement of client to terminate business relationship must show that defendant "has committed some impropriety in doing so"); *La Rocco v. Bakwin*, 439 N.E.2d 537, 542-43 (Ill. App. 1982) (Reinhard, J.) (reversing summary judgment for defendant and citing relevant Restatement sections).

We express no opinion on whether the preemption defense is preserved for further proceedings in the district court. We have treated federal preemption as an affirmative defense upon which the defendant bears the burden of proof, *Village of DePue v. Exxon Mobil Corp.*, 537 F.3d 775, 786 (7th Cir. 2008), and presumably the burden of persuasion, even if no additional facts must be proven and the issue is only a question of law. Affirmative defenses "must ordinarily be included in the defendant's answer, but 'a delay in asserting an affirmative defense waives the defense only if the plaintiff was harmed as a result.'" *Best v. City of Portland*, 554 F.3d 698, 700 (7th Cir. 2009), quoting *Curtis v. Timberlake*, 436 F.3d 709, 711 (7th Cir. 2005). We leave it to the district court to decide whether the defendants have permanently waived the preemption defense by not raising it until after the preliminary injunction was issued.

IV. *RMG's Status as an "Aggrieved Party"*

Attacking the injunction from a third direction, the defendants argue that RMG failed to prove that it is an "aggrieved party" under the Illinois Cable Piracy Act and therefore should be unable to sue under that statute. The defendants' objections are essentially evidentiary. They contend that RMG deliberately falsified some business forms that reported why subscribers ended their relationship with RMG to make it look as if those subscribers left RMG because of defendants' misconduct. The district court, they argue, improperly admitted and relied on this evidence in concluding that RMG had lost

business because of the defendants' unfair competition, then compounded this error by not giving the defendants sufficient opportunity to challenge that evidence. These objections are without merit.

The forms that RMG supposedly took pains to falsify were introduced into evidence not by RMG but by the defendants themselves. RMG had produced them in discovery for the preliminary injunction hearing and even included a few of the forms in its binder of potential exhibits for the hearing, but RMG did not move for their admission or question any witness about them until after defendants offered them.

The defendants suggest in response that other evidence—documents summarizing RMG's lost business and the testimony of an RMG witness—was tainted because it was based on the allegedly falsified forms. But even if there were some danger of deception in RMG's evidence, the district judge was aware of that possibility. From the beginning of the preliminary injunction hearing, he said he was open to evidence of "deceptive practice." Judge Darrah further made clear that if the defendants could show that the disconnect forms had been falsified, he would "entertain a motion to strike any evidence that's derivative of these documents." The defendants introduced the forms into evidence and pointed out the discrepancies between the two copies, but they did not move to strike. RMG, meanwhile, elicited from its witness a plausible and uncontradicted explanation for the discrepancy: RMG's Chicago office had followed up with former subscribers after mailing

originals of the disconnect forms to its home office, so that only the Chicago office's copies had the additional information obtained by telephone indicating that the subscribers had left RMG for Cable America.

Moreover, RMG introduced a great deal of other evidence that defendants' misconduct had hurt RMG's business. That evidence included summaries of the large numbers of lost subscribers based on the original disconnect forms, testimony that building owners had completely excluded RMG from their buildings after Cable America's arrival, and circumstantial evidence of causation based on the timing of RMG's lost subscriptions. Given the abundance of independent evidence sustaining RMG's claim, the district judge did not abuse his discretion by cutting off further challenges to the disconnect forms offered by defendants themselves.

## V.  *Res Judicata or Claim Preclusion*

The defendants also contend that this entire lawsuit is barred by the doctrine of claim preclusion or res judicata because of a 2001 settlement between the parties in an Illinois state court. This diversity suit is barred only if it would be barred under Illinois law. See 28 U.S.C. § 1738; *Marrese v. American Academy of Orthopaedic Surgeons*, 470 U.S. 373, 380 (1985). In general, the doctrine of claim preclusion or res judicata bars a party from asserting a claim that has already been resolved in another lawsuit between the same parties or those in privity with them, and the doctrine reaches both claims that were actually asserted in an earlier lawsuit and those

that could have been asserted but were not. See *Aaron v. Mahl*, 550 F.3d 659, 664 (7th Cir. 2008); *Highway J Citizens Group v. United States Department of Transportation*, 456 F.3d 734, 741 (7th Cir. 2006).

In Illinois, res judicata applies if two claims "arise from a single group of operative facts, regardless of whether they assert different theories of relief." *River Park, Inc. v. City of Highland Park*, 703 N.E.2d 883, 893 (Ill. 1998). That test is not met here because the claims resolved in the 2001 suit arose from a set of operative facts different from those that support the claims in this suit. The district court properly rejected the res judicata defense.

In 2001, RMG sued Cable America in Illinois state court for misuse and damage of RMG's equipment and for pirating Russian-language programming owned by TV Russian Network (TVR). That lawsuit was settled on July 31, 2001, with the court retaining jurisdiction to enforce the agreement.

Separately, at some point before RMG filed this suit on June 30, 2006, defendant Harmelech and his companies began pirating Russian-language programming from DIRECTV and DishNetwork. This new scheme involved some but not all of the buildings covered by the 2001 settlement.

The defendants cannot fit their theft of TVR's programming in 2001 and their theft of DIRECTV's and DishNetwork's programming in 2006 into one set of operative facts. Certainly there are similarities in terms of modus operandi and the identity of the competitor-victim. But the defendants' argument is akin to saying

that the theft of a victim's car in 2001 and theft of the same victim's car in 2006 constitute only one set of operative facts, so that a lawsuit based on the earlier theft would bar one based on the latter. Res judicata does not preclude a suit arising from a completely different event, no matter how similar the defendant's misconduct. See *D'Last Corp. v. Ugent*, 681 N.E.2d 12, 17 (Ill. App. 1997) ("The doctrine of res judicata does not bar claims for continuing conduct complained of in the second lawsuit that occur after judgment has been entered in the first lawsuit."), citing *Lawlor v. National Screen Service Corp.*, 349 U.S. 322 (1955). In this suit, plaintiff RMG alleged and proved events that had not yet occurred at the time of the 2001 suit and violations of a statute that did not even exist at the time of the 2001 suit. See *City of Chicago v. Midland Smelting Co.*, 896 N.E.2d 364, 379 (Ill. App. 2008) (res judicata did not apply when second suit was brought pursuant to an ordinance that did not exist at the time of the first suit).

## VI. *Contempt*

Defendants have also asked us to vacate the district court's finding of contempt, though the district court has not yet imposed the specific sanctions that would be needed to give us appellate jurisdiction over the contempt finding. See *United States v. Torres*, 142 F.3d 962, 970 (7th Cir. 1998) (civil contempt order to pay a sum that had not yet been determined by district court was not appealable). Because we uphold the injunction, we do not reach the validity of the contempt order. In

future proceedings, the district court should not hesitate to take the steps needed to ensure compliance with its orders.

The orders of the district court in both appeals are AFFIRMED.