In the

# United States Court of Appeals

### For the Seventh Circuit

―――――――――――

No. 19-3396

CONSUMER FINANCIAL PROTECTION BUREAU,

*Plaintiff-Appellee,*

*v.*

CONSUMER FIRST LEGAL GROUP, LLC, *et al.,*

*Defendants-Appellants.*

―――――――――――

Appeal from the United States District Court for the
Western District of Wisconsin.
No. 3:14-cv-00513-wmc — **William M. Conley**, *Judge.*

―――――――――――

ARGUED JANUARY 12, 2021 — DECIDED JULY 23, 2021

―――――――――――

Before EASTERBROOK, WOOD, and ST. EVE, *Circuit Judges.*

WOOD, *Circuit Judge.* The financial crisis of 2007–2008 sent shock waves throughout the national economy. Perhaps nowhere were the effects felt harder than in the residential mortgage sector. According to one source, more than seven million homes entered foreclosure between 2007 and 2010. See S. Rep. No. 111-176, at 39 (2010). This appeal concerns the rules that apply to mortgage-assistance relief services. The question is whether the Consumer Financial Protection Bureau ("the

Bureau") correctly declined to treat two high-volume, na-
tional law practices under the rules governing lawyers, and
thus whether the stiff penalties that were imposed on the
firms (and their principals) can stand. We conclude that the
Bureau's decision that the firms and lawyers were not en-
gaged in the practice of law was supported by the record, but
that further proceedings are necessary on the issue of reme-
dies.

**I**

As desperate people faced the imminent loss of their
homes, many for-profit mortgage-assistance relief services
(MARS), which promised to obtain loan modifications that
would stave off foreclosure, sprang up. The more dubious
among these businesses charged consumers thousands of dol-
lars in up-front fees and induced signups through deceptive
statements about the quality of their services. Mortgage As-
sistance Relief Services, 75 Fed. Reg. 75092, 75095–96 (Dec. 1,
2010). The money often bought little to nothing. Once a per-
son enrolled, many MARS providers "fail[ed] to perform even
the most basic promised services or achieve any beneficial re-
sults." *Id.* at 75097. This was doubly unfortunate because, at
the same time, many nonprofits and government agencies of-
fered similar services at no cost. *Id.* at 75093–94 & nn.29–35.

Congress quickly identified mortgage-relief scams as a
glaring problem, and it directed the Federal Trade Commis-
sion to issue rules relating to "unfair or deceptive acts or prac-
tices involving loan modification and foreclosure rescue ser-
vices." Credit Card Accountability, Responsibility, and Dis-
closure Act of 2009, Pub. L. No. 111-24, § 511(a), 123 Stat. 1734,
1764; see also Omnibus Appropriations Act of 2009, Pub. L.
No. 111-8, § 626(a), 123 Stat. 524, 678 (instructing the FTC to

"initiate a rulemaking proceeding with respect to mortgage loans").

The FTC did so, issuing its final rule on December 1, 2010. See 75 Fed. Reg. 75092 (then-codified at 16 C.F.R. pt. 322, now at 12 C.F.R. pt. 1015). The rule focused on the "widespread" "unfair or deceptive practices of MARS providers" and the harm these actors had inflicted on consumers. *Id.* at 75096. Among other things, the rule prohibited MARS providers from charging upfront fees, telling consumers not to talk to their lenders, and misrepresenting material aspects of their services. See 12 C.F.R. §§ 1015.3, 1015.5.

The rule also addressed the role of attorneys. It acknowledged that many attorneys and law firms that represent financially distressed persons offer mortgage-relief services in connection with their legal practice. *Id.* at 75095. Recognizing the traditional role that the states play in regulating the attorney-client relationship, the final rule exempted attorneys from most MARS regulations so long as they (1) "provide[] mortgage assistance relief service as part of the practice of law," (2) are "licensed to practice law in the state in which the[ir] consumer … resides," and (3) "compl[y] with state laws and regulations that cover the same type of conduct the rule requires." See 12 C.F.R. § 1015.7(a).

While the FTC's rulemaking was underway, Congress was also busy. It overhauled the federal consumer protection apparatus as part of the Dodd-Frank Wall Street Reform and Consumer Financial Protection Act of 2010, Pub. L. No. 111-203, 124 Stat. 1376. Title X of Dodd-Frank, known as the Consumer Financial Protection Act ("the Act"), established the Bureau as the federal government's primary consumer protection agency when it comes to financial matters. 12 U.S.C.

§ 5511(a)–(b). The Act also transferred responsibility over numerous consumer protection areas formerly overseen by other agencies to the Bureau. One such area was the FTC's authority over mortgage practices. See 124 Stat. at 2036–37, 2102–03. This transfer took effect on July 21, 2011, several months after the FTC issued its final rule. See 12 U.S.C. § 5582; 75 Fed. Reg. 57252 (Sept. 20, 2010). Shortly after the baton was passed, the Bureau reissued the FTC's MARS rule as Regulation O. See 76 Fed. Reg. 78130 (Dec. 16, 2011) (promulgating 12 C.F.R. pt. 1015). Finally, cognizant of the role attorneys may play in the provision of consumer financial services, as well as the traditional role that states play in regulating attorney conduct, Congress stripped the Bureau of "supervisory or enforcement authority with respect to an activity engaged in by an attorney as part of the practice of law under the laws of a State in which the attorney is licensed to practice." See 12 U.S.C. § 5517(e)(1).

## II

This case arises out of a civil enforcement action brought by the Bureau against two firms—The Mortgage Law Group, LLP ("the Mortgage Group"), and Consumer First Legal Group, LLC ("Consumer First")—and four lawyers associated with them—Thomas Macey, Jeffrey Aleman, Jason Searns, and Harold Stafford (collectively, "the Providers"). The Bureau alleges that while providing mortgage-assistance relief services to more than 6,000 customers across 39 states, the defendants violated Regulation O by making misrepresentations about their services, failing to make mandatory disclosures, and collecting unlawful advance fees.

Macey, Aleman, and Searns formed the Mortgage Group in 2011. Stafford founded Consumer First in January 2012. After six months of operation, Stafford sold 95% of Consumer First to Macey, Aleman, and Searns, who operated the firm similarly to the Mortgage Group. (Since Consumer First operated differently before and after the sale, we distinguish the firm's two ownership periods by referring to it as Consumer First I or Consumer First II where appropriate.)

The firms' business model focused on offering mortgage modification services to distressed homeowners. They directly employed four to five attorneys at their headquarters in Chicago and associated themselves with local attorneys in the various states in which they conducted business. The bulk of the firms' actual work, however, was performed by 30 to 40 nonattorneys (called "client intake specialists"), who enrolled customers, gathered the necessary documents for modification applications, reviewed those documents, answered consumer questions, and submitted loan-modification applications to lenders.

The intake specialists operated out of a centralized call center and worked off a standardized script. If a consumer expressed interest in mortgage-relief services, the specialist transferred her to an attorney at company headquarters. This attorney also worked off a script, which contained prepared statements about the program and fees. After each statement, the attorney asked the prospective customer whether he or she understood. If the customer answered "yes" each time, the attorney transferred her back to the intake specialist to sign a retainer agreement for services.

The firms charged each customer an initial retainer fee of $1,000 to $2,000, followed by recurring monthly fees of $500

to $1,000 until services were ended. On average, the firms ended up collecting $3,375 per client. Critically, under the terms of the retainer agreement, these fees covered only the firms' loan-modification services. If a customer asked the firms to perform additional work beyond the submission of the initial loan-modification application—for example, legal representation in a foreclosure proceeding or bankruptcy proceeding—those services had to be negotiated and paid for separately.

Intake specialists gathered from customers the financial documents needed to submit a loan-modification application on the customer's behalf. Once these documents were in hand, the intake specialist signaled in an internal firm system that the customer's packet was ready for "attorney review." An attorney at headquarters would review the customer's file and then pass it along to a local attorney in the customer's home state for additional review.

The firms had affiliations with local attorneys in most states in which they accepted customers. The firms classified these arrangements as "Class B" memberships or partnerships. But that label was misleading: the local attorneys did not share in the firms' profits or losses, nor did they supervise or control the firms' staff or operations. Instead, they were paid low, flat-rate fees ($25 to $40) for each task they completed.

Local attorney reviews were perfunctory: the attorneys' primary responsibility was to make sure that all the required documents were present for a loan modification application. Most reviews took between five and ten minutes. Rarely would a local attorney recommend that a customer be declined or send a loan-modification application back because

of problems. Local attorneys almost never communicated directly with customers. After a customer's file was approved, an intake specialist—not an attorney—sent the loan-modification application to the customer's loan servicer.

The Mortgage Group and Consumer First operated for about two years. During that time, the Mortgage Group obtained loan modifications for 26% of its customers (1,369 out of 5,265) and Consumer First II obtained loan modifications for 17% of its customers (190 out of 1,116). The Mortgage Group ceased operations by the third quarter of 2013. Consumer First II stopped taking new clients in November 2012 and stopped serving existing clients in the second quarter of 2013.

The Bureau initiated this lawsuit in 2014. The case was originally assigned to Judge Crabb, who handled most of the pretrial proceedings. On the Bureau's motion for summary judgment, Judge Crabb partially invalidated sections 1015.7(a)(3) & (b) of Regulation O's attorney exemption as inconsistent with the Act, but her order left intact the heart of Regulation O's exemption, sections 1015.7(a)(1)–(2). In addition, Judge Crabb granted summary judgment against the Providers on the following five issues:

(1) charging unlawful advance fees, in violation of 12 C.F.R. § 1015.5(a);

(2) failing to make disclosures required by 12 C.F.R. § 1015.4;

(3) implying in their welcome letter to customers that the customer should not communicate with lenders, in violation of 12 C.F.R. § 1015.3;

(4) implying that consumers current on mortgages should stop making payments, in violation of 12 C.F.R. § 1015.3(b)(4); and

(5) misrepresenting the performance of nonprofit alternative services, in violation of 12 C.F.R. § 1015.3(b)(9).

Judge Crabb also held that individual defendants Aleman, Searns, and Macey could be held personally liable for the Mortgage Group and Consumer First II, and that the appropriate measure for restitution would be the firms' net revenue (*i.e.*, fees collected minus refunds given).

Shortly thereafter, the case was transferred to Judge Conley, who held a bench trial to resolve the remaining factual issues in the case, including whether the Providers qualified for the attorney exemption in the Act and Regulation O. On November 11, 2018, Judge Conley issued a posttrial order in which he concluded that the Providers were not exempt from Regulation O, because the tasks completed by the firms' attorneys did not amount to the "practice of law." Judge Conley also determined that Consumer First II, Aleman, and Searns were liable for (1) misleading customers into thinking that they would receive legal representation and (2) for advising customers during intake calls not to communicate with their lenders. He concluded that Consumer First II, Macey, Aleman, and Searns would be subject to civil penalties under a recklessness standard, but that Consumer First I and Stafford would be subject to the lower civil penalties that apply to offenses that fall under the strict-liability standard. (The Mortgage Group filed for bankruptcy during the pendency of this action; the Bureau and the trustee agreed to a consent order, which the district court entered as amended in November

2018. The Mortgage Group is therefore not a party to this appeal.)

The court issued its remedies decision on November 4, 2019. In accordance with Judge Crabb's earlier rulings, it ordered restitution in the amount of $21,709,021. It then assessed the following civil penalties: $11,350,000 for Macey; $14,785,000 for Aleman; $8,002,500 for Searns; $32,250 for Stafford, and $3,121,500 for Consumer First II. Finally, the court permanently enjoined Macey, Aleman, and Searns from providing "debt relief services."

### III

Consumer First II, Macey, Aleman, and Searns ("Appellants") challenge the district court's judgment on five grounds. First and foremost, they maintain that they are exempt from liability because they were practicing law. If, however, that exemption does not cover them, Appellants argue in the alternative that the evidence did not support three violations for which they were found liable. Finally, Appellants identify three problems with the district court's remedy: its use of net profits rather than net revenues for purposes of restitution; the finding of recklessness for the civil penalties, as well as the periods to which those penalties applied; and overbreadth of the injunction.

### A

We begin with Appellants' primary contention: that the Bureau lacks the authority to bring this action because as attorneys they are exempt from liability under Regulation O and the Act. The language of the statute is critical, and so we set it out in full:

(1) In general

Except as provided under paragraph (2), the Bureau may not exercise any supervisory or enforcement authority with respect to an activity engaged in by an attorney as part of the practice of law under *the laws of the State in which the attorney is licensed to practice law.*

(2) Rule of construction

Paragraph (1) shall not be construed so as to limit the exercise of the Bureau of any supervisory, enforcement, or other authority regarding the offering or provision of a consumer financial product or service …

(A) that is not offered or provided as part of, or incidental to, the practice of law, occurring exclusively within the scope of the attorney-client relationship; or

(B) that is otherwise offered or provided by the attorney in question with respect to any consumer who is not receiving legal advice or services from the attorney in connection with such financial product or service.

(3) Existing authority

Paragraph (1) shall not be construed so as to limit the authority of the Bureau with respect to any attorney, to the extent that such attorney is otherwise subject to any of the enumerated consumer laws or authorities transferred under subtitle F or H [of the Dodd-Frank Wall Street Reform and Consumer Financial Protection Act of 2010].

12 U.S.C. § 5517(e) (emphasis added).

Regulation O's exemption is worded differently. It provides:

(a) An attorney is exempt from this part, with the exception of § 1015.5, if the attorney:

(1) Provides mortgage assistance relief services as part of the practice of law;

(2) Is licensed to practice law in *the state in which the consumer* for whom the attorney is providing mortgage assistance relief services *resides* or in which the consumer's dwelling is located; and

(3) Complies with state laws and regulations that cover the same type of conduct the rule requires.

(b) An attorney who is exempt pursuant to paragraph (a) of this section is also exempt from § 1015.5 if the attorney:

(1) Deposits any funds received from the consumer prior to performing legal services in a client trust account; and

(2) Complies with all state laws and regulations, including licensing regulations, applicable to client trust accounts.

12 C.F.R. § 1015.7 (emphasis added).

Before trial, the district court assigned Appellants the burden of proving their eligibility for the attorney exemption. After trial, the court held that they failed to meet that burden, because they did not show that the attorneys associated with the firm were engaged in the "practice of law" as defined by any of the states in which they did business. As this was a bench trial, we review the court's factual findings for clear

error and its legal conclusions *de novo*. *Morisch v. United States*, 653 F.3d 522, 528 (7th Cir. 2011). Clear error review also applies to the court's applications of law to facts in this setting.

1

We begin with the relation between the Act and Regulation O. We do so because, if and to the extent that Regulation O strays beyond the statutory boundaries, we cannot rely on it. This problem arises because (as we highlighted above) the attorney exemption is expressed differently in the Act and the Regulation. Appellants pointed this out before trial. They argued that the Act establishes the outer bounds of the Bureau's authority over attorneys, and that the Bureau cannot expand its authority by imposing in a regulation additional requirements attorneys must meet to be exempt from liability. Since sections 1015.7(a)(3) and (b) of Regulation O do exactly that, Appellants contended, they must be set aside as contrary to the Bureau's statutory authority. See 5 U.S.C. § 706(2)(C).

The Bureau did not deny that Regulation O exempts a narrower category of attorneys from liability than section 5517(e)(1) of the Act describes. Instead, it maintained that the Regulation O attorney exemption is a valid exercise of the authority conferred by the saving clause of section 5517(e)(3). Subsection (e)(3) says that the attorney exemption in section 5517(e)(1) does not limit the Bureau's authority over any attorneys "otherwise subject to any of the enumerated consumer laws or authorities transferred under subtitle F or H [of the Dodd-Frank Act.]" In the Bureau's view, Regulation O is one of those "authorities transferred under subtitle F or H," because it originally was authorized and promulgated as an FTC rule pursuant to section 626 of the Omnibus Appropriations Act of 2009. The Dodd-Frank Act later transferred that

authority to the Bureau. Thus, the Board argued, section 5517(e)(1) of the Act does not constrain the scope of the attorney exemption in Regulation O.

The district court found that Appellants had the better of this argument. It invalidated sections 1015.7(a)(3) and (b) of Regulation O, concluding that they were in "direct conflict" with the attorney exemption in the Act. The court rejected the Bureau's use of the saving clause, because it failed to explain why "Congress would prohibit [the Bureau] from regulating attorneys engaged in the practice of law" in subsection (e)(1) "and then create an exception that swallows the general prohibition." It left undisturbed the other provisions of Regulation O's attorney exemption, see 12 C.F.R. § 1015.7(a)(1)–(2), because Appellants did not argue that they exceeded the Bureau's rulemaking authority.

On appeal, the Bureau asserts that the district court erred in its legal assessment of sections 1015.7(a)(3) and (b). Appellants defend the court's ruling and argue—for the first time on appeal—that it should have gone further. Their new focus is on section 1015.7(a)(2), which requires an attorney to be licensed in the same state as the consumer-client in order to be exempt.

We can be brief about sections 1015.7(a)(3) and (b) of the regulation. They exceed the Act's grant of authority to the Bureau and so must be set aside. See 5 U.S.C. § 706(2)(C). We also reject the idea that section 5517(e)(3) furnishes the necessary authority to add extra conditions that an attorney must meet to qualify for exemption. On the latter point, we agree with the district court that the Bureau's reading of section 5517(e)(3) would effectively render subsection (e)(1) a nullity. That is not a sensible way to read a statute. Subsection (e)(3)

performs a clarifying function: it confirms that an attorney who otherwise is subject to liability for violating consumer laws in his personal capacity—that is, outside the context of an attorney-client relationship—cannot escape liability simply by virtue of being an attorney. Two aspects of section 5517(e) confirm this reading. First, subsection (e)(3) begins with the words "Paragraph (1) shall not be construed so as to …"—indicating that subsection (e)(3) clarifies subsection (e)(1)'s meaning but does not make a substantive change to it. Second, subsection (e)(1) itself purports to be limited only by subsection (e)(2), but not (e)(3), since it begins: "*Except as provided under paragraph (2)*, the Bureau may not exercise any supervisory or enforcement authority with respect to an activity engaged in by an attorney as part of the practice of law … ." (Emphasis added.)

While we affirm this aspect of the district court's order, we agree with Appellants that section 1015.7(a)(2) of Regulation O exceeds the statutory boundaries. We acknowledge that they did not present this argument to the district court. We have discretion, however, to address pure questions of law for the first time on appeal. See, *e.g.*, *Hively v. Ivy Tech Cmty. Coll. of Ind.*, 853 F.3d 339, 351 (7th Cir. 2017) (en banc); *Amcast Indus. Corp. v. Detrex Corp.*, 2 F.3d 746, 750 (7th Cir. 1993). We exercise that discretion here in the interest of judicial economy and because the resolution of this issue is important to the coherence and continued functioning of the regulatory scheme.

An easy way to illustrate the problem with section 1015.7(a)(2) is by considering the nature of national law firms. Lawyers licensed in and operating out of one state ("national attorneys") are entitled to advise clients in other states in

which they are not licensed, so long as they affiliate them-selves with local counsel. See, *e.g.*, MODEL RULES OF PRO. CONDUCT r. 5.5(c) (AM. BAR ASS'N 2019). This arrangement is permitted under the legal-practice rules of every state. Section 1015.7(a)(2) sits uneasily with this rule. It purports to exempt from the Act only those attorneys who are "licensed to prac-tice law in the state in which the[ir] consumer … resides." In other words, it allows the Bureau to regulate a "national at-torney" who provides legal services to a client living in a state where the attorney is not licensed.

The Act, by contrast, exempts such an attorney from regu-lation so long as she is engaged in the practice of law as de-fined by the state in which *she* is licensed. The Act does not care about the state where the client lives. It follows that sec-tion 1015.7(a)(2), like sections 1015.7(a)(3) and (b), impermis-sibly broadens the class of attorneys who are subject to Regu-lation O, in direct conflict with the Act. This conflict is unam-biguous, and so our inquiry stops there. See *Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984); *City of Arlington v. FCC*, 569 U.S. 290, 296–97 (2013) (applying *Chevron* to agency interpretations concerning the scope of their statutory authority). Section 1015.7(a)(2) is contrary to the Bureau's statutory authority and cannot stand. See 5 U.S.C. 706(2)(C).

2

With this much established, we are ready to turn to the merits of the appeal. Under the Act and the remaining provi-sion of Regulation O, the Bureau is authorized to bring its ac-tion against Appellants so long as the attorneys associated with the firms did not provide mortgage relief services "as part of the practice of law." 12 U.S.C. § 5517(e)(1); 12 C.F.R.

§ 1015.7(a)(1). The district court made just that finding after the bench trial.

In an effort to simplify its task, the district court surveyed the practice-of-law definitions of the 39 states in which Appellants serviced clients. Based on this review, it distilled the inquiry down to the following question, common to all: whether the attorney's conduct involved "[t]he application of legal principles and judgment to a particular set of facts." (The court noted that it had been guided in this respect by ABA Model Rule of Professional Conduct 5.5.) It invited the parties to explain why it could not analyze practice-of-law in each state according to this common inquiry. Neither side responded.

Having settled on a test common to all states, the district court proceeded to analyze the activities of the firms' attorneys. It focused on the firms' local attorneys—that is, the people who the firms represented to customers would be providing them with legal representation. The court determined as a factual matter that "local counsel's involvement consisted primarily, and in most cases exclusively, of pro forma document review" and that "the role of the local attorney was *by design* almost always perfunctory, rather than substantive." As a result, the court concluded that the firms' local attorneys did not apply "legal principles and judgment to a particular set of facts" and so were not engaged in the "legitimate practice of law."

While some might have seen the facts the other way, we see no clear error in this conclusion. The record at trial showed that, in the normal course of the firms' provision of mortgage-relief services, attorneys conducted brief reviews to be sure that a few basic pieces of financial information

(already reviewed and approved by nonattorney intake specialists) were in the file. They were not checking these documents for substance. At trial, two local attorneys testified that nothing they did during their "review" involved the application of legal principles or use of legal knowledge. Apart from a few rare exceptions, local attorneys did not meet with consumers, email consumers, or exchange information with consumers. Nor did they negotiate with or even contact lenders or servicers—that work was undertaken by the firms' nonattorney staff. When customers received modifications from their loan servicers, the firms' attorneys did not review or advise consumers on their terms.

Defendants maintain that the firms' local attorneys practiced law because they sometimes provided legal services such as a foreclosure defense. But these services were performed for only a tiny number of customers. These isolated instances do not undermine the court's conclusion. As section 5517(e)(2)(B) of the Act makes clear, the Bureau is authorized to regulate services performed for customers who do not receive any legal advice or services in connection with those services. That is the case here.

Appellants raise two further objections to the district court's "practice of law" holding, both for the first time on appeal. First, they complain that the district court committed legal error by selecting a common definition of "practice of law" for all the states in which the firms did business. They criticize the court for failing to find that its common inquiry was a *necessary* condition for the practice of law in each state, and now, on appeal, they point to examples of states that use a broader definition than the one the court adopted. (They identify Texas, Minnesota, and South Carolina as examples.)

That may be, but we consider this argument to be waived and without merit in any event. The court said that its definition was a "*fundamental* inquiry" in all relevant states—a *sine qua non* for the practice of law in each of the relevant jurisdictions. The court did not force this definition on anyone. To the contrary, it expressly invited the parties to explain why the test it had selected would not work for every state. Appellants passed up this opportunity. If they now are unsatisfied with the test the district court selected, they have only themselves to blame.

Appellants' second objection concerns the burden of proof. For purposes of summary judgment, the district court determined that they had the burden of proving that they qualify for the attorney exemption. See *NLRB v. Kentucky River Cmty. Care, Inc.*, 532 U.S. 706, 711 (2001) ("[T]he burden of proving justification or exemption under a special exemption to prohibitions of a statute generally rests on one who claims its benefits."); see *United States v. An Article of Device*, 731 F.2d 1253, 1260–62 (7th Cir. 1984) (applying the same principle to a regulatory exemption).

Appellants now argue, once again for the first time on appeal, that the burden should have been placed on the Bureau, because it is the Bureau that is claiming the benefit of an exemption, not them. Appellants reason that section 5517(e)(1) of the Act creates a baseline rule under which the Bureau cannot enforce regulations against *any* attorneys engaged in the practice of law. Section 5517(e)(2) then carves out an exception to that rule for attorneys who provide mortgage-relief services separate from the practice of law. It is through this "exemption-within-an-exemption," Appellants conclude,

that the Bureau obtains the authority to enforce Regulation O against a subset of attorneys.

In the abstract, this may not be a bad point, but it runs up against the statute's own characterization of these subsections. The Act labels subsection (e)(2) as a "rule of construction"—not an exception—and then explains that the general rule in subsection (e)(1) "shall not be construed so as to limit" the Bureau's authority over mortgage services provided separately from the practice of law. This indicates that subsection (e)(2) is part of the general prohibition, not an exception to it. Moreover, section 5517(e) is titled "Exclusion for practice of law," which suggests that the entire section operates as an exception to the Bureau's general authority to regulate "unfair, deceptive, or abusive" practices. 12 U.S.C. § 5511(b)(2).

We need not conclusively resolve this matter, because Appellants forfeited their argument by failing to raise it before the district court. See, *e.g.*, *Scheidler v. Indiana*, 914 F.3d 535, 540 (7th Cir. 2019). When the court considered where to place the burden of proof, the only consideration Appellants raised related to the difficulty of proving some of the criteria imposed by Regulation O (*e.g.*, 12 C.F.R. § 1015.7(a)(3)'s requirement that firm attorneys comply with "state laws and regulations"). They did not contend that the burden should be placed on the Bureau because section 5517(e) was an authority-stripping provision rather than an exemption. It is too late now to raise that argument.

That leaves one final matter for us to address before we proceed to the district court's findings on liability. The district court's practice-of-law analysis predominantly focused on whether the attorney exemption in Regulation O applied to Appellants' conduct. But its analysis depended on its view

that section 1015.7(a)(2) was valid. This caused it to limit itself to the work done by "attorney[s] licensed in the state in which the consumer … resides." In other words, its focus was on the local attorneys, not the handful of headquarters attorneys. This omission is potentially significant, because the Act's attorney exemption removes enforcement authority from the Bureau if *any* attorney who provides mortgage-relief services to a customer does so as part of the practice of law (not just the "local attorneys" licensed in the state in which the customer resides). If the firms' headquarters attorneys were engaged in the practice of law, then we can assume that Appellants would be exempt from liability.

Although the apparent lack of discussion about the headquarters attorneys seems troublesome at first glance—it is the district court's job, not ours, to find facts—upon closer examination we see that the problem is more one of labels and opinion organization than it is of omitted findings. The district court found as a matter of fact that the headquarters attorneys' involvement with any given customer was limited to two things: (1) performing a brief, redundant review of financial documents (just as the local attorneys were doing), and (2) reading through an enrollment script with "prepared consumer statements about the program and fees" when a customer first signed up. Under the common definition of practice of law that the court employed in this case, these activities do not amount to legal practice. The district court took into account the work that headquarters attorneys performed when it considered whether Appellants had misrepresented to customers that they would receive legal services. It concluded that the headquarters attorneys' role did nothing to cure that misrepresentation. These findings, while perhaps

somewhat misfiled, show that the role of the headquarters attorney cannot save Appellants here.

B

The Bureau had to show more than the Appellants' ineligibility for the legal-services exemption. It had to establish a substantive violation. Some of the practices on which the court based its liability findings are, at this point, uncontested: collecting upfront fees, 12 C.F.R. § 1015.5(a); misrepresenting to consumers that they would receive legal representation, *id.* § 1015.3(b)(8); and failing to provide required disclosures, *id.* § 1015.4(b). Appellants do, however, still contest their liability on three other counts:

(1) advising customers not to communicate with their loan servicers in their welcome letter and during sales calls, *id.* § 1015.3(a);

(2) telling consumers to stop making payments to their lenders, *id.* § 1015.3(b)(4); and

(3) misrepresenting the performance of free alternatives to their services, *id.* § 1015.3(b)(9).

Judge Crabb found that Appellants had engaged in the second and third of these practices in her summary judgment ruling; Judge Conley found the first after trial.

Although two different standards of review apply (*de novo* for items 2 and 3, clear error for item 1), in the end we find no cause for reversal. The first finding is strongly supported by Appellants' "welcome letter." It advised customers that speaking to loan servicers was "risky" and could lead to customers being "hurt by deceptive practices," implying that they should avoid contacting their servicers. Even though the

letter was prefaced by a seemingly contrary statement ("While we will not tell you not to speak to your servicer … ."), the court was entitled as trier of fact to conclude that this preface did not do enough to dispel the message found in the letter's body. Appellants counter that the information they communicated was true, and that based on experience they in fact believed that communicating with servicers was risky. But the Regulation takes the opposite view, and no one has challenged section 1015.3(a). Judge Conley also found, based on unrebutted evidence at trial, that Appellants' customers were told on sales calls not to contact their loan servicers. There was ample evidence to support the first point above.

Appellants also fail to persuade us that we should reverse their liability on the second point—improperly telling consumers to stop making payments to their lenders. See 12 C.F.R. § 1015.3(b)(4). At summary judgment, Judge Crabb determined that certain statements in the sales scripts communicated to customers that they should cease making payments to their lenders. These included informing customers that mortgage-relief programs are "hardship based," and that a "person who is a year behind is much more helpful than some[one] who is current"—a statement that was followed up with the question "[w]ill you be helpful during this process … ?" The record also indicated that staff routinely told consumers to stop making payments, which they called "strategically falling behind." Appellants point to other parts of the script that seem contradictory, such as advice to salespeople not to "tell a client … to stop paying a mortgage," and they note that the typical customer was already behind on her mortgage. Neither of these points undermines summary judgment. Unrebutted evidence in the summary judgment record showed that the salespeople routinely made these

misleading statements, perhaps confusing matters even further with contradictions. And even though many clients were in arrears, it still could have been possible for them to keep current with their payments.

We also affirm Appellants' liability on the third point—misrepresenting the performance of alternatives to for-profit MARS providers. See 12 C.F.R. § 1015.3(b)(9). Judge Crabb grounded her summary judgment ruling on certain statements in the sales script that advised customers that free MARS alternatives only provide "a document checklist," "tell you what paper work you'll need to gather to submit to your bank to attempt a modification," and won't "get the results you're really after, which is mortgage relief." A salesperson testified that intake specialists discouraged customers on the phone from using free loan-modification services. At summary judgment, defendants' sole response was that they disclosed in their retainer agreement that free services were available. But disclosure of services does nothing to correct misrepresentations about the quality of nonprofit alternatives. Appellants now assert that summary judgment was inappropriate because there was no evidence in the record that their statements were wrong. But by not raising this argument in the district court, they have forfeited it. See *Nichols v. Mich. City Plant Planning Dep't*, 755 F.3d 594, 600 (7th Cir. 2014). In any event, this argument is not persuasive because the misrepresentation Appellants made was not solely about the relative effectiveness of for-profit and nonprofit mortgage assistance services. Appellants insinuated that nonprofit alternatives would not get consumers *any* relief. No evidence existed that would have permitted a trier of fact to find that Appellants were not engaged in that behavior, and indeed, the

record indicated that Appellants' success rate was not materially different from that of the nonprofits.

## IV

That brings us to remedies. As we noted earlier, the overall monetary judgment was very large. The district court based its order of restitution on the firms' net revenues; this came to $21,709,021. It then assessed the following civil penalties: $11,350,000 for Macey; $14,785,000 for Aleman; $8,002,500 for Searns; $32,250 for Stafford, and $3,121,500 for Consumer First. Finally, the court permanently enjoined Macey, Aleman, and Searns from providing "debt relief services" in the future.

Appellants urge us to vacate all aspects of the remedial order. They argue that the restitution order was legally erroneous because it exceeded the firms' net profits. They also contend that the court's civil penalties were excessive because they were based on a miscalculation of the penalty period and on an erroneous finding that Appellants acted recklessly. Finally, they assert that the district court's injunction was overbroad. We agree with Appellants on all three points.

### A

We first address the district court's restitution award. The Act permits a court to grant "any appropriate legal or equitable relief," including restitution. See 12 U.S.C. § 5565(a). At summary judgment, Judge Crabb defined the appropriate level of damages in this case as "net revenues"—that is, gross receipts minus any refunds issued. This total came out to $21,709,021.

After the court issued its restitution award, however, the Supreme Court handed down its decision in *Liu v. SEC*, 140 S. Ct. 1936 (2020). In *Liu*, which dealt with the scope of equitable

relief available in an SEC civil enforcement action, the Court held that a disgorgement award may not exceed a firm's net profits. *Id.* at 1946. The question is whether *Liu* compels us to vacate the restitution award here and remand for re-calculation based on net profits. We are persuaded that it does.

The Bureau disagrees with this position. It points out that *Liu* concerned disgorgement, whereas the district court here ordered restitution. But we find this to be too narrow a reading of *Liu*. *Liu*'s reasoning is not limited to disgorgement; instead, the opinion purports to set forth a rule applicable to all categories of equitable relief, including restitution. *Id.* at 1945–46.

The Bureau's argument also founders because it assumes that equitable restitution and disgorgement are two different animals. The Court, however, expressed doubts on this point in *Liu*. See *id.* at 1942–43 (observing that the definition of the equitable remedy of disgorgement is unclear and has gone by several labels over time, including restitution). The district court seemed unsure whether there was a difference between the two terms: its order interchangeably uses the words restitution and disgorgement to describe its remedy.

Finally, the Bureau suggests that *Liu* is inapplicable because the statute at issue in *Liu* authorized only "equitable relief," whereas the Act in our case authorizes courts to award equitable and *legal* relief. Compare 15 U.S.C. § 78u(d)(5), with 12 U.S.C. § 5565(a). Accordingly, the Bureau urges us to uphold the court's order as an award of *legal* restitution. We reject this argument also. The district court understood itself to be awarding equitable relief, which is why it cited equitable restitution cases in support of its order. See, *e.g.*, *FTC v. Febre*, 128 F.3d 530, 536 (7th Cir. 1997).

B

Appellants next ask us to vacate the court's civil penalties. The Act authorizes courts to assess such penalties against defendants who violate federal consumer financial laws. It establishes three tiers of culpability: strict-liability violations, which carry penalties of $5,000 per day; reckless violations, at $25,000 per day; and knowing violations, at $1,000,000 per day. 12 U.S.C. § 5565(c)(2). We generally review an award of civil penalties for an abuse of discretion. See, *e.g.*, *SEC v. Williky*, 942 F.3d 389, 393 (7th Cir. 2019).

The district court concluded that Macey, Aleman, and Stearns acted recklessly with respect to their violations; that Stafford was liable for his violations only under a strict liability theory; that Consumer First I committed strict-liability violations; and that Consumer First II committed reckless violations.

Appellants take issue with the district court's conclusion that Macey, Aleman, Searns, and Consumer First II recklessly violated the Act. A defendant acts recklessly when his conduct involves "an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 68–69 (2007). (There was some uncertainty below as to whether the Bureau was required to prove recklessness only with respect to the facts constituting an offense, or with respect to the illegality of that conduct. We agree with the district court that the latter test is the correct one, since the conduct at issue here is not obviously wrongful, dangerous, or illegal on its face. See *Liparota v. United States*, 471 U.S. 419, 433 (1985).)

Appellants insist that they were not aware of a risk that their conduct was illegal, nor should they have been, because Regulation O prohibits conduct that is commonplace for lawyers, such as requiring advance retainer payments and providing advice not to communicate with opposing parties. They also maintain that because Regulation O is a complicated regulatory regime, their violations were more a product of misapprehending the regulation's applicability than of recklessness. Finally, they point to a legal opinion they received; that opinion informed them that their structure qualified as a national law firm. They contend that this opinion led them to believe they would be exempt from Regulation O.

Appellants have a point. Although we have found that they were not engaged in the practice of law, the question was a legitimate one. We consider it a step too far to say that they were reckless—that is, that they should have been aware of an *unjustifiably high or obvious* risk of violating Regulation O. We thus vacate the district court's recklessness finding with respect to Macey, Aleman, Searns, and Consumer First II. On remand, the district court must apply the penalty structure for strict-liability violations.

Appellants' next challenge is to the period that each penalty covers. The Act assigns a monetary penalty for each day a violation persists. See 12 U.S.C. § 5565(c)(2). The district court calculated a different penalty period for each category of violations. One of these related to enrollment violations. The district court measured these periods by selecting the last day each firm enrolled a customer as the end of its period of "enrollment violations." It selected January 2, 2013, for the Mortgage Group and January 4, 2013, for Consumer First II. Appellants contend that the record does not support those

dates. Instead, it shows that the Mortgage Group and Consumer First II stopped accepting new clients on October 30, 2012, and November 30, 2012, respectively. Appellants argued, though did not prove conclusively, that the January 2013 data entries were coding errors. But even if the January outliers were true enrollments, Appellants contend that it was error for the district court to include all the days between October 30, 2012, and January 2, 2013, for the Mortgage Group and all the days between November 30, 2012, and January 4, 2013, for Consumer First II, when no enrollments happened between those dates.

Once again, we think that Appellants have the better of the debate. Although they failed to prove their data-entry-error theory, they should not have been accountable for all the days between their second-to-last enrollments in Fall 2012 and their last enrollments in January 2013. Instead, the court should have ended the firms' enrollment violations penalty periods on October 30, 2012, and November 30, 2012, and (if it so wished) tacked on one extra day of violations to account for the January 2013 enrollments. We therefore vacate this portion of the court's order and remand for recalculation.

C

Finally, Appellants object to the breadth of the injunction, which permanently banned Macey, Aleman, and Searns from providing "debt relief services," as that term is defined in 12 C.F.R. § 310.2(*o*). They argue that the record does not support such a broad injunction and complain that it would create undue hardship for the individual defendants, who are career bankruptcy attorneys and so would be banned from practicing law in their chosen field.

The scope of an injunction generally is committed to the discretion of the district court. *Russian Media Grp., LLC v. Cable Am., Inc.*, 598 F.3d 302, 307 (7th Cir. 2010). "[An] injunction must … be broad enough to be effective," *id.*; but it cannot be "more burdensome to the defendant than necessary to accord complete relief to the plaintiffs," *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).

This injunction needs some tailoring. A few considerations lead us to this conclusion. First, the violations at issue here concerned mortgage-relief services, not debt-relief services as a whole. Moreover, we have found that Appellants' violations were not knowing or reckless, and so an injunction of this breadth is not necessary to protect the public against future harm. Finally, we think it significant that Appellants' mortgage-relief operations, though undoubtedly flawed in many respects, were not a complete scam: at the end of the day, the Mortgage Group and Consumer First did in fact obtain loan modifications for hundreds of customers during their roughly two years of operation. Those firms have long since gone out of business, and so the injunction need only ensure that the individual defendants do not stray beyond the scope of the Act and its implementing regulations.

## V

The judgment of the district court is AFFIRMED IN PART and VACATED IN PART. We VACATE the district court's restitution award, civil penalties, and injunction, and REMAND the case for further proceedings consistent with this opinion.