In the

# United States Court of Appeals
## For the Seventh Circuit

No. 25-1395

UNITED STATES OF AMERICA,

*Plaintiff,*

*v.*

THOMAS LINDSTROM,

*Defendant,*

*and*

RYAN BUILDING GROUP, INC.,

*Third-Party Citation Respondent-Appellee.*

APPEAL OF DAVID VENKUS,

*Restitution Judgment Creditor.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 16-cr-00631 — **Lindsay C. Jenkins**, *Judge.*

ARGUED DECEMBER 9, 2025 — DECIDED FEBRUARY 23, 2026

Before HAMILTON, ST. EVE, and PRYOR, *Circuit Judges.*

ST. EVE, *Circuit Judge*. This appeal stems from David Ven-kus's attempt to enforce a $13,776,518 criminal restitution judgment against Thomas Lindstrom, his former employee and a convicted fraudster who caused the collapse of Ven-kus's trading firm. Venkus served Lindstrom's then-em-ployer, Ryan Building Group, Inc. ("RBG"), with a citation to discover assets, pursuant to Illinois law. The citation prohib-ited RBG from transferring certain of Lindstrom's assets that RBG controlled. When RBG later terminated Lindstrom (after discovering he had embezzled from the company), it gave him $73,090—a "hypothetical" calculation it based on the value of stock options Lindstrom accumulated during his em-ployment but never exercised offset by debt Lindstrom owed RBG. RBG called the payment a "severance" and claimed it was a goodwill gesture it gratuitously gave a former em-ployee who it terminated for stealing.

After Venkus discovered the severance payment, he moved in the district court for a finding that RBG had violated the citation and sought a judgment ordering RBG to pay him the value of the stock options. The district court denied Ven-kus's motion. Because Venkus has raised material questions of fact surrounding the nature of the severance payment and whether RBG violated the citation, we reverse and remand for an evidentiary hearing and further proceedings consistent with this opinion.

## I. Background

In 1991, Venkus started Rock Capital, a now-defunct pro-prietary trading firm based in Northfield, Illinois. Lindstrom worked for Rock Capital as a trader for over 20 years—nearly the firm's entire existence. Lindstrom earned 80% of any net

profit on his trades, while Rock Capital kept the remaining 20%.

In 2016, the United States charged Lindstrom with eight counts of securities and wire fraud. The indictment detailed Lindstrom's scheme to defraud Rock Capital by falsely making it appear as though his trades were profitable. Lindstrom's scheme boosted his compensation but caused Rock Capital to lose $13,776,518 and ultimately cease operations. Lindstrom eventually pleaded guilty to one count of wire fraud. In 2019, the district court sentenced Lindstrom to 60 months in prison and 2 years of supervised release. It also ordered Lindstrom to pay Venkus restitution in the amount of $13,776,518. Venkus subsequently registered the restitution as a civil judgment and began attempts to collect on it.

Lindstrom started working for RBG in March 2015, before his indictment; he worked at the company until his incarceration and RBG reemployed him upon release. Lindstrom's time at RBG, like his time at Rock Capital, was tumultuous, to say the least. Over the course of his employment, RBG compensated Lindstrom through a semi-monthly salary and stock options.[1] Lindstrom also racked up debt owed to RBG, including (i) $230,000 he used to fund his criminal defense; (ii) $69,016 charged to RBG's corporate credit card for personal expenses, which he then claimed as business expenses; and (iii) $10,000 that RBG spent uncovering these wrongful expenses. In total, Lindstrom owed RBG $372,543.

---

[1] The stock options Lindstrom earned during his employment vested over time. According to the stock options agreement, the options would expire 30 days after termination by RBG if unexercised.

In 2022, Venkus moved in the district court for a citation to discover assets against RBG, pursuant to Illinois's judgment enforcement law, 735 ILCS 5/2–1402. Through the citation, Venkus sought to discover assets controlled by RBG that Lindstrom owned or that RBG owed Lindstrom. The district court granted Venkus's motion, and Venkus served it on RBG. Upon service, the citation created a perfected lien on the assets to which it applied. § 2–1402(m). The order also included a provision prohibiting RBG from transferring assets under the citation. § 2–1402(f). And, because RBG never perfected a lien on the debt Lindstrom owed the company, the parties do not dispute that Venkus's citation was the most senior lien on the assets.[2]

RBG responded to the citation. First, it explained it paid Lindstrom a semi-monthly salary. Illinois law applies a 15% garnishment cap to "wages" a judgment debtor earns. 735 ILCS 5/12–803. So RBG's citation response determined Venkus was entitled to $918.75 per month—15% of Lindstrom's semi-monthly salary. Second, RBG also explained that Lindstrom had an interest in vested stock options that "have been pledged as a security for a loan and the amount owed on the loan is more than the value of any vested options."

Following RBG's response, Venkus moved for a turnover order as to the 15% of Lindstrom's semi-monthly salary. His motion did not request turnover of the stock options. Rather,

---

[2] In addition to Venkus's citation and Lindstrom's debt to RBG, a third lien existed—a family court order entitling Lindstrom's ex-wife to a portion of his earnings. That order, which the court entered in 2023, also did not have priority over Venkus's lien.

he reserved his "right to seek relief as to the stock options identified by [RBG]." The district court entered the turnover order, directing RBG to pay Venkus Lindstrom's non-exempt wages pursuant to § 12–803. Following the order, RBG made monthly payments to Venkus.

In October 2023, RBG discovered Lindstrom had embezzled funds by charging personal expenses to his RBG expense account. It terminated Lindstrom and stopped paying Venkus the 15% of Lindstrom's semi-monthly salary. Three weeks later, it informed Venkus it had terminated Lindstrom and that it was "still working out any severance." Over the next one to two months, Venkus, through counsel, repeatedly requested that RBG send him information about Lindstrom's termination and about the severance RBG claimed it was calculating. But RBG barely responded to Venkus's counsel, provided no information, and delayed its response. Meanwhile, Lindstrom allegedly never exercised his vested options, which, pursuant to the options agreement, expired 30 days after his termination. Venkus never moved for a turnover order as to the options.

In late December 2023, RBG paid Venkus $10,963 without any explanation. Venkus asked RBG for the "basis" of the payment, but, as was becoming a common theme, RBG continued to delay. In January 2024, Lindstrom (not RBG) sent Venkus a document titled "Ryan Building Group Tom Lindstrom Options Net Payout." The document, which Lindstrom signed, first detailed the "Fully Vested Options Payout"—valuing Lindstrom's supposedly now-expired options at $445,633. Next, it deducted $372,543—the debt Lindstrom owed RBG. Finally, it arrived at Lindstrom's $73,090 severance

payment—the difference between the value of options and the debt Lindstrom owed RBG.

Venkus then moved in the district court for an order directing RBG to show cause based on this document, which the district court granted. In response, RBG explained:

> Lindstrom received gross severance in the amount of $73,090. RBG calculated this amount by taking the amount that Lindstrom would have received had he exercised his stock options ($445,633) and subtracted amounts Lindstrom owed to RBG, including repayment of personal loan[s] for which the options were collateral, totaling $372,543, for a gross severance in the amount of $73,090. Of that gross severance amount, RBG paid 15% ($10,963) to [Venkus] based on its understanding of the Court's turnover order [] that RBG is required to pay 15% of amounts due to Lindstrom to [Venkus].

Continuing, it said the stock options "ha[d] expired" and the "value of the stock options is $0." RBG used the previous value of the options as a "hypothetical" benchmark from which to calculate the severance. In its supplemental response, RBG reiterated that "the Stock Options were offered as security for the Lindstrom Loan pursuant to an oral agreement between the Defendant and RBG; this agreement was not reduced to writing." But it acknowledged "it did not make a public filing to perfect a secured interest in the Stock Options."

Venkus, dissatisfied with this response, moved in the district court for a finding that RBG had violated the citation. He asked the district court to order RBG to pay him the full value

of the stock options (minus the $10,963 RBG had already paid). Venkus argued RBG violated the citation when it transferred the value of Lindstrom's stock options ($445,633) to itself, outside the lien priority, because RBG deducted the debt Lindstrom owed RBG ($372,543)—a junior lien—from the value of the options. By doing so, Venkus claimed RBG impermissibly recovered the debt Lindstrom owed it ahead of his superior claim to the value of the options. Venkus further argued that RBG violated the citation by paying him only 15% of the severance, as, according to Venkus, a lump-sum severance payment is not subject to § 12–803's 15% garnishment cap. Finally, Venkus sought attorney's fees.

Opposing Venkus's motion, RBG reiterated that the severance payment was "hypothetical." Claiming the options had no value by December 2023, RBG said it used their previous value as a baseline from which to calculate the severance package, offsetting that value with the debt Lindstrom owed as "[Lindstrom] was required to repay those debts before exercising the options." But, RBG said, because the options had no value by the time it calculated the severance payment, it could not have violated the citation by transferring the value of the stock options to itself. Nor could it have recovered the debt Lindstrom owed the company. Continuing, RBG viewed a severance payment as "wages" under § 12–803 and subject to the 15% cap.

The district court denied Venkus's motion based on the briefs. *United States v. Lindstrom*, No. 16 CR 631, 2025 WL 524028 (N.D. Ill. Feb. 18, 2025). First, it found RBG did not violate the citation in calculating Lindstrom's severance. *Id.* at *4–*6. Agreeing with RBG, the district court found that because the options had expired, they had no value by

December 2023—thus, the severance was a "hypothetical" calculation, and RBG did not subvert the citation. *Id.* Second, the district court interpreted § 12–803 to cover severance payments and found that RBG did not violate the citation by paying Venkus only 15% of Lindstrom's severance. *Id.* at \*6–\*9. Because it found RBG had not violated the citation, the district court concluded RBG was not liable for attorney's fees. *Id.* at \*9. Venkus appealed.

## II. Discussion

Federal Rule of Civil Procedure 69(a)(1) governs enforcement of money judgments and directs federal courts to apply "the procedure of the state where the court is located." To enforce a judgment, the Illinois Code of Civil Procedure permits a judgment creditor to serve a citation to discover assets on individuals and entities the creditor believes control assets owned by the judgment debtor. 735 ILCS 5/2–1402(a) (judgment creditor may "prosecute citations to discover assets for the purposes of examining the judgment debtor or any other person to discover assets or income of the debtor not exempt from the enforcement of the judgment"); *see also Mendez v. Republic Bank*, 725 F.3d 651, 662 (7th Cir. 2013). Section 2–1402(m) explains that "[t]he judgment or balance due on the judgment becomes a lien when a citation is served." Section 2–1402(f) provides that the citation may prohibit a party served under the citation from transferring assets to which the citation applies and states that a party who makes such a transfer may be liable to the judgment creditor. As discussed earlier, the district court granted Venkus a citation to discover assets against RBG pursuant to § 2–1402, and the citation included a provision prohibiting RBG from transferring assets:

YOU ARE PROHIBITED from making or allowing any transfer or other disposition of, or interfering with, any property not exempt from execution or garnishment belonging to the judgment debtor or to which he may be entitled, or which may be acquired by or become due to the judgment debtor and from paying over or otherwise disposing of any money not so exempt, which is due or becomes due to judgment debtor, until further order of court or termination of the proceedings. You are required to withhold the payment or transfer of any money or other property no more than twice the amount of the unsatisfied judgment.

Venkus seeks to recover against RBG for violating the citation by transferring Lindstrom's assets. To prevail, Venkus must show "(1) that [he] has an enforceable judgment, (2) that [he] properly served a citation upon [RBG], and (3) that [RBG] transferred assets of the judgment debtor in violation of the citation's restraining provision." *Mendez*, 725 F.3d at 663. Only the third element is in dispute.[3]

Venkus contends RBG twice violated the citation: (1) through its calculation of Lindstrom's severance and (2) by determining that a "severance" payment is "wages" for

---

[3] The parties also dispute the standard of review we apply to a motion for a finding of § 2–1402 liability. Our case law is admittedly limited. In *Mendez*, we reviewed such a motion de novo because we found that the question presented was "of law rather than fact." 725 F.3d at 662. This makes sense and is in line with our approach to similar issues, where we review questions of law de novo and findings of fact for clear error. But we leave for another day resolution of the standard of review we apply when reviewing a motion for a finding of § 2–1402 liability because the resolution of this appeal does not turn on the standard of review.

purposes of § 12–803 and therefore paying Venkus only 15% of the payment. We turn first to the severance calculation. We then move to the § 12–803 question. Finally, we briefly address Venkus's request for attorney's fees.

## A. Severance Calculation

Whether RBG violated the citation hinges on whether its calculation of Lindstrom's $73,090 severance impermissibly transferred the value of Lindstrom's stock options to itself rather than to Venkus. In other words, should Venkus have received payments derived from the full $445,633 value of the stock options because RBG calculated the severance based on the options' full value offset by the debt Lindstrom owed it?

Section 2–1402(f)(1)'s "restraining provision" requires a third party under a citation "to freeze assets" of the judgment debtor that the citation entitles the judgment creditor to claim. *Door Props., LLC v. Nahlawi*, 188 N.E.3d 806, 811 (Ill. App. Ct. 2020) (quoting *Kauffman v. Wrenn*, 46 N.E.3d 805, 812–13 (Ill. App. Ct. 2015)); *see also United States v. Sheth*, 759 F.3d 711, 717 (7th Cir. 2014). The citation is not an injunction; rather, it puts the party subject to the citation on "notice … that if [it] transfers property subject to the supplementary proceeding, thereby attempting to impede the administration of justice, and places the property beyond the reach of the court, [it] will be punished either by having a judgment entered against [it] for the amount of the judgment creditor's claim or the value of the property, whichever is less, or may be punished as and for contempt." *Bank of Aspen v. Fox Cartage, Inc.*, 533 N.E.2d 1080, 1083 (Ill. 1989) (citation modified); *see also BMO Harris Bank N.A. v. Joe Contarino, Inc.*, 74 N.E.3d 1091, 1099 (Ill. App. Ct. 2017). The citation is meant to "prevent the judgment debtor or third party from disposing of those assets before the

judgment creditor can reach them." *Door Props.*, 188 N.E.3d at 811.

Once the citation is served, the judgment debtor or the third party cannot "frustrat[e] the supplementary proceedings." *Bank of Aspen*, 533 N.E.2d at 1083 (quoting *Kirchheimer Bros. Co. v. Jewelry Mine, Ltd.*, 426 N.E.2d 1110, 1113 (Ill. App. Ct. 1981)); *cf.* 740 ILCS 160/5(a)(1) (debtor may not "hinder, delay, or defraud any creditor"). A party who engages in "evasive conduct" may "frustrate the purpose of the restraining provision." *Nat'l Life Real Est. Holdings, LLC v. Scarlato*, 83 N.E.3d 44, 57 (Ill. App. Ct. 2017). The citation "requires that the party hold property which is subject to the reach of the judgment creditor in status quo until the judgment creditor's rights can be determined." *Kirchheimer Bros. Co.*, 426 N.E.2d at 1113; *see also* Illinois Law & Practice, Executions § 112 (Nov. 2025) (citing *Vendo Co. v. Stoner*, 438 N.E.2d 933, 938 (Ill. App. Ct. 1982)). RBG could not "dispos[e] of [the] assets before [Venkus could] reach them," *Door Props.*, 188 N.E.3d at 811, nor could it interfere with Venkus's right to eventually claim them, *see Bank of Aspen*, 533 N.E.2d at 1083.

Venkus has raised questions of fact as to whether RBG interfered with or "frustrated" his right to claim the stock options. We are skeptical of the nature of this transaction given the strange manner in which RBG treated the stock options, Lindstrom's debt to the RBG, and the purported gratuitous "severance" payment it decided to pay Lindstrom upon termination after he stole from the company. Although not directly analogous to the facts at issue here, decisions by Illinois courts examining potential citation violations help inform this skepticism.

Consider *National Life Real Estate Holdings*, for example, in which the Appellate Court of Illinois found that a party under a citation engaged in "evasive conduct" to avoid a judgment debtor's ability to collect under the citation. *See generally* 83 N.E.3d 44. There, National Life sought to recover a $3.5 million judgment it held against Ronald Scarlato. *Id.* at 46. To enforce its judgment, National Life served the International Bank of Chicago ("IBC") with a citation to discover assets, prohibiting IBC from transferring Scarlato's assets. *Id.* Scarlato and two LLCs of which he was the managing member then took out a $3.5 million loan from IBC. *Id.* at 47–48. The loan agreement limited Scarlato's use of advances to only funding a specific construction project in which IBC held an interest. *Id.* at 48. Scarlato and the two LLCs requested a $3.5 million "advance" under the loan agreement, directing that IBC disburse it to a construction escrow agent. *Id.* IBC disbursed some of the funds to the escrow agent and disbursed the rest to third parties and accounts controlled by the LLCs. *Id.* at 48–49. After learning of the loan, National Life moved for a judgment that IBC violated the citation by disbursing the loan to at least one third party. *Id.* On appeal, the court held that IBC violated the citation's restraining provision. *Id.* at 58–59. Explaining that § 2–1402 is to be "construed liberally," the court found that IBC engaged in "evasive conduct" that "frustrate[d] the purpose of" § 2–1402. *Id.* at 55, 57. A judgment debtor would frustrate § 2–1402 if he could "enter into loan agreements with third-party lending institutions that merely include language restricting the debtor's ability to access the funds, while at the same time allowing the debtor the authority to request disbursements." *Id.* at 57. Upholding such behavior would "create an avenue by which judgment debtors would be able to avoid the consequences of the judgment." *Id.*

Or, compare *Door Properties*, where the Appellate Court of Illinois determined that a gratuitous money gift from a party under a citation to a judgment debtor would fall outside § 2–1402's scope and remanded for an evidentiary hearing to further the develop the record on whether the payment at issue was or was not gratuitous. *See generally* 188 N.E.3d 806. Door Properties, LLC sought to enforce a $750,000 judgment it obtained against Ayad Nahlawi and, accordingly, served a citation to discover assets on Mago BB, LLC, which Nahlawi's parents and two friends controlled. *Id.* at 807–09. Three years later, Door Properties learned that Mago had paid at least $15,000 to cover Nahlawi's attorney fees in various legal matters. *Id.* at 808. It then moved for a finding that Mago had violated the citation, arguing the $15,000 was property Nahlawi possessed (as debt Mago owed him) and thus Mago should have paid it to Door Properties. *Id.* Mago responded that the payment was "a gift and reciprocation for favors" that Nahlawi had done for his parents and friends in the past and was thus exempt from the citation because it was not property owned by or owed to Nahlawi. *Id.* (citation modified). The trial court found that § 2–1402 covered the funds, and entered judgment for Door Properties. The Appellate Court of Illinois reversed and remanded for an evidentiary hearing to determine the nature of the payment and whether it was covered by § 2–1402. *Id.* The court explained § 2–1402 would reach the payment if Mago made it for "debt" it owed Nahlawi as debt is "'property' of the judgment debtor," but "a gratuitous payment on the judgment debtor's behalf, out of goodwill or love or familial obligation" is "not covered by" § 2–1402. *Id.* at 814.

Our law on fraudulent transfers generally aids our analysis as well. First, 11 U.S.C § 548(a)(1)(A) allows a bankruptcy trustee to "avoid any transfer … of an interest of the debtor"

if the debtor "made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted." A trustee need not point to "[d]irect proof of actual intent to defraud" to succeed. *Frierdich v. Mottaz*, 294 F.3d 864, 869–70 (7th Cir. 2002). Rather, circumstantial "badges of fraud" can establish intent. *Id.*; *see also In re Chi. Mgmt. Consulting Grp., Inc.*, 929 F.3d 803, 809 (7th Cir. 2019). Such "badges" include:

> [W]hether the debtor retained possession or control of the property after the transfer, whether the transferee shared a familial or other close relationship with the debtor, whether the debtor received consideration for the transfer, whether the transfer was disclosed or concealed, whether the debtor made the transfer before or after being threatened with suit by creditors, whether the transfer involved substantially all of the debtor's assets, whether the debtor absconded, and whether the debtor was or became solvent at the time of the transfer.

*Frierdich*, 294 F.3d at 870 (citing 5 *Collier on Bankruptcy* ¶ 548.04(2)(b) (15th ed.)); *cf. In re Chavin*, 150 F.3d 726, 729 (7th Cir. 1998) (listing indicators of intent to defraud creditors and the trustee under 11 U.S.C. § 727(a)(2)).

Second, Illinois's Uniform Fraudulent Transfer Act ("UFTA"), 740 ILCS 160/5, provides that a "transfer made … by a debtor is fraudulent as to a creditor" if the debtor made the transfer "with actual intent to hinder, delay, or defraud any creditor of the debtor," § 5(a)(1). Courts look to the indicators of fraud the UFTA provides. § 5(b)(1)–(11) (listing

indicia of "actual intent" to defraud courts may consider "among other factors"); *see also Wachovia Sec., LLC v. Banco Panamericano, Inc.*, 674 F.3d 743, 757–58 (7th Cir. 2012). Relevant too is whether the debtor made the transfer "in good faith," where "good faith will probably be lacking if the transferee knows that the transfer may be voidable because he knows of an outstanding judgment against the transferor." *For Your Ease Only, Inc. v. Calgon Carbon Corp.*, 560 F.3d 717, 721 (7th Cir. 2009).

Neither statute, of course, is directly applicable here. Both deal with transfers made by a debtor to avoid debts owed to a creditor. Here, however, RBG was not itself Venkus's debtor; the creditor-debtor relationship is between Venkus and Lindstrom. But these provisions provide guidance and are instructive. Our underlying inquiry is similarly whether RBG frustrated Venkus's rights as a creditor by wrongly transferring the value of the stock options.

Remember, the citation required RBG to "freeze" assets owned by Lindstrom which it controlled. RBG could not "interfere with" or "frustrate" the citation, including by engaging in "evasive conduct." With these principles in mind, we find RBG's calculation of the severance payment highly suspect based on the limited record before us. Before his termination, Lindstrom (i) according to RBG, "misappropriated" and later embezzled funds from the company; (ii) accumulated over $370,000 in debt he owed RBG, on top of the over $13 million he owed Venkus—an amount which took priority over the debt he owed RBG; and (iii) was convicted of fraud. We find it doubtful an employer would pay an employee a "gratuitous" severance upon termination given these circumstances, especially as RBG had no obligation to pay anything

when terminating Lindstrom if Lindstrom did not timely exercise the options.

We further note that the severance payment enabled RBG to avoid paying Lindstrom (and Venkus) the full value of the options. *Cf. Nat'l Life Real Est. Holdings*, 83 N.E.3d at 55–57 (party can violate the citation by engaging in "evasive conduct" which "frustrate[s] the purpose of" § 2–1402). RBG also retained an amount equal to the debt Lindstrom owed it; an amount it otherwise would not have been able to recover as Lindstrom's funds would first go to Venkus until Lindstrom had paid off the $13,776,518 given the lien priority. We struggle to understand why RBG would have paid Lindstrom anything if it was not recovering the significant debt Lindstrom owed and if it did not owe Lindstrom the value of the options. And we struggle to understand why Lindstrom did not exercise the options, particularly given the existing debt and restitution he owed. To be sure, RBG claims Lindstrom's debt is still on its books. But, if that is true, it leaves us with even more questions about the motivation and purpose behind the "severance" payment and why RBG relied on the debt Lindstrom owed in calculating his severance in the first place.

The record needs further development of the facts and circumstances leading to RBG's calculation of Lindstrom's severance. There may be "additional evidence that is pertinent," which the district court should consider "in the first instance." *For Your Ease Only*, 560 F.3d at 723 (remanding for evidentiary hearing before district court to consider whether third party violated citation); *see also Door Props.*, 188 N.E.3d at 816. We, therefore, remand for the district court to hold an evidentiary hearing to uncover answers to the questions we raise. We leave it to the sound discretion of the capable district court to

decide whether further discovery or other proceedings are necessary.

### B. 735 ILCS 5/12–801, 803

The question remains of whether RBG violated the citation by paying Venkus only 15% of the severance because it determined Illinois's 15% wage garnishment cap, § 12-803, applies to severance payments. Venkus claims § 12-803 does not apply to severance payments so he should have received 100% of the severance, not 15%.

The statute at issue is the Illinois Wage Deduction Act ("IWDA"), 735 ILCS 5/12–801–19. The IWDA governs wage garnishment by judgment creditors. Relevant for our purposes are two subparts: (1) the general "definitions" provision, § 12–801, which defines "wages" as "any hourly pay, salaries, commissions, bonuses, or other compensation owed by an employer to a judgment debtor"; and (2) the 15% garnishment cap, § 12–803, which provides, in relevant part, that "[t]he wages, salary, commissions and bonuses subject to collection under a deduction order, for any work week shall be … 15% of such gross amount paid for that week …."

Before the district court, Venkus conceded that a "severance" payment fell under § 12–801's definition of "wages," but disputed whether § 12–803's 15% cap applied to that same severance. On appeal, Venkus attempts to walk back that concession. He now disputes both whether "wages" in § 12–801 includes a "severance" payment and, either way, whether § 12–803's 15% cap applies to such a severance payment.

#### 1. "Wages" under § 12–801

Ordinarily, an issue a party fails to raise, fails to develop, or concedes before the district court is waived on appeal. *See*

*Ross v. Fin. Asset Mgmt. Sys., Inc.*, 74 F.4th 429, 434 (7th Cir. 2023); *Cintas Corp. v. Perry*, 517 F.3d 459, 466 (7th Cir. 2008). In some instances, and at our discretion, we have recognized an exception for a "pure issue of statutory interpretation." *Haroco, Inc. v. Am. Nat'l Bank & Tr. Co.*, 38 F.3d 1429, 1439 (7th Cir. 1994) (quoting *Amcast Indus. Corp v. Detrex Corp.*, 2 F.3d 746, 749 (7th Cir. 1993) (reasoning that because forfeiture is a "sanction" which "should be related to harm done or threatened," we can find an argument not forfeited, despite a party's "failure to present [the] ground to the district court" when there is no harm)). We *may*, at our discretion, consider such an issue if it is "fully argued in the brief[s]." *Id.*; *see CFPB v. Consumer First Legal Grp., LLC*, 6 F.4th 694, 705 (7th Cir. 2021) (framing *Amcast*'s rule as one of "discretion"). We exercise this discretion "sparingly" and "in 'rare instances.'" *Soo Line R.R. Co. v. Consol. Rail Corp.*, 965 F.3d 596, 601–02 (7th Cir. 2020) (quoting *In re Sw. Airlines Voucher Litig.*, 799 F.3d 701, 714 (7th Cir. 2015)).

This case is not one of the "rare instances" where we will exercise our discretion. Venkus does not explain *why* we should consider the issue (beyond now arguing that a severance payment is not "wages" under § 12–801). Moreover, he did not merely "fail" to raise the issue before the district court. He affirmatively conceded it. On remand, we leave it to the district court to decide whether to excuse Venkus's previous concession.[4]

---

[4] If the district court excuses Venkus's concession on remand, we note an additional issue. Section 12–801 defines "wages" as "any hourly pay, salaries, commissions, bonuses, or other compensation *owed* by an

### 2. "Severance" under § 12-803

Turning to the 15% garnishment cap, § 12–803 states that the cap applies to the "wages, salary, commissions and bonuses subject to collection under a deduction order, for any work week." Venkus contends § 12–803 contains a "periodicity" requirement because it includes the "for any work week" language and states that the 15% cap applies to the "gross amount paid for that week." That is, the 15% cap only applies to "wages, salary, commissions and bonuses" paid on some periodic basis. But, he argues, because a severance payment is a one-time lump sum, even if the severance falls under § 12–801's "wages," it is not "wages" subject to § 12–803's 15% cap as it lacks periodicity.

We think this issue likely relies, in large part, on whether (1) severance payments generally fall under § 12–801's definition of "wages" and (2) whether the payment here was indeed

---

employer to a judgment debtor." (emphasis added). As noted, RBG repeatedly characterized the payment as gratuitous and not required, which sounds more like a gift. At oral argument, counsel for RBG explained that no contract or agreement obligated RBG to pay Lindstrom a severance. RBG was just trying to "do right by [Lindstrom]." That is, RBG did not "owe[]" Lindstrom severance. Counsel also explained that Lindstrom's pay stub listed the payment as a "stock bonus." There appears to be a question over whether a "gratuitous" severance is "*owed* by an employer to a judgment debtor," § 12–801 (emphasis added), such that it falls under § 12–801's definition of "wages," even if the district court decides a "severance" payment generally—such as one a contract obligates an employer to pay—does. We leave it to the district court to first decide this question and the underlying questions of fact regarding the nature of the payment here. It might also be that the citation does not cover the payment in the first place. *See Door Props.*, 188 N.E.3d at 814–15 (citation's transfer prohibition does not apply to gratuitous money gift).

a severance payment that is "wages" for § 12–801's purposes. We remand for the district court to address these questions in the first instance.

**C. Attorney's Fees**

Finally, a brief point on attorney's fees. Section 2–1402(f) allows the court to "punish any party who violates the restraining provision of a citation as and for [] contempt." Upon a finding of contempt, Illinois permits attorney's fees "as part of the penalty." *W. Bend Mut. Ins. Co. v. Belmont State Corp.*, 712 F.3d 1030, 1035 (7th Cir. 2013). Proving contempt is a two-step test: First, the party moving for contempt must show a "[f]ailure to comply with a[] [court] order" which "serves as *prima facie* evidence of contempt." *Webber v. Zimmerlein*, No. 3-24-0157, 2025 WL 1734066, at *11 (Ill. App. Ct. June 23, 2025). If satisfied, "the onus shifts to the contemnor to prove that the violation was not willful or contumacious and he or she had a valid excuse for failing to follow the order." *Id.*

The district court did not reach Venkus's request for fees or the question of contempt because it found RBG had not violated the citation. Because we remand for the district court to hold further proceedings, the district court should also, if it finds RBG violated the citation, consider whether to award attorney's fees.

\*        \*        \*

For the reasons discussed, we REVERSE the decision of the district court and REMAND for an evidentiary hearing and any further discovery and proceedings the district court deems necessary.